We should have Mr. Mowrey, Mr. Powell, and Mr. Kirkpatrick on the line and we appreciate you making yourselves available by phone for this argument we meet under extraordinary circumstances. Wish we were with you in person, but let's go ahead and proceed with the argument. Mr. Mowrey. Thank you, Your Honor. May it please the Court, Horry Mowrey, and I appear on behalf of Appellant Robert Downey. I request four minutes for rebuttal, please. Okay, that's a done. Thank you. So, Your Honors, reversal of the District Court is required in this case for two reasons. The first is that Mr. Downey's amended complaint and second amended complaint were filed when he was no longer a prisoner and were not subject to the Prison Litigation Reform Act pursuant to Federal Civil Procedure 15, as has recently been analyzed in depth in the case of Garrett v. Wexford, Third Circuit. If the Court applies Garrett to Mr. Downey's case, then the second reason may not even be addressed. However, the second reason is that even if Mr. Downey's status as a prisoner at the time of filing his original complaint somehow controls for purposes of the applicability of the administrative exhaustion requirement, the grievance policy is still inapplicable by its own terms because it excludes urgent or emergent situations. So let's assume just for the sake of discussion that we didn't agree with you that the fortuity of the timing here took you out from under the PLRA. Your assertion is that, of course, he's still okay because he doesn't have to exhaust in an urgent situation, right? I mean, that's all over your briefing. Yes, Your Honor. As between those two positions, which one do you think is the better one legally? Well, as between application of Garrett or application of arguing the policy, I'm sorry. I just want to clarify your question. Yes, that's right. Okay. Well, application of Garrett is a bright-line rule that this Court has handed down that makes clear that the time of the filing of an amendment supersedes and renders null a previous complaint such that, according to Jones v. Bach, Rule 15 requirements supersede the PLRA requirements unless they're specifically set forth otherwise. So the stronger position is clearly the Garrett decision. Isn't it the case that, though, in that third amended complaint, the prisoner was still identifying himself? I mean, Mr. Day was still saying prisoner, or has that been changed by then? Your Honor, there was no third amended, but in the second amended complaint – I'm sorry. No, that's okay. It's referenced that he was a prisoner. It's in the past tense and says he was incarcerated at all times relevant to the action. It does not specifically say he is now not a prisoner. But for purposes of pleading such a requirement, this Court has indicated that it's not an affirmative pleading requirement. It is an affirmative defense. If somebody wants to raise – defendants want to raise the status of being a prisoner and the application of failure to exhaust, even the District Court cited that language in its decision. So although we didn't expressly state he is no longer a prisoner, we did term it in the past tense, and this Court has indicated that it's not even a pleading requirement nonetheless. Can I ask you a question? Because the timing here is more than suspicious. What would stop prisoners who know they're going to be released soon or are willing to wait until they're released from simply ignoring the Prison Litigation Reform Act's exhaustion requirements and proceeding in federal court, barring any statute of limitations issues? Sure. And there is not a statute of limitation issue to apply in this situation. We, on behalf of Mr. Downey, filed the initial complaint. Of course, he was an inmate at the time. The very next day, he was released. We had filed the amendment as a matter of right to cure some legalese terms in the original amendment. It had nothing to do with any gaming of the system. In fact, we didn't even know our office at the time that as of filing the First Amendment complaint, he was now no longer an inmate. Did I hear you correctly that he filed the initial complaint the day before he was released? He did file the day before he was released. And you don't find that timing to be suspicious? Well, in this situation, I can say I don't at all because we were representing him at no knowledge as to when he was going to be released. There was not a date certain set for him. In fact, the day he was released, he didn't know he was going to be released that day. So, I understand the question, but I can say that there was certainly no nefarious purpose of filing the amendment other than to fix some legalese we recognized immediately to cure the original complaint. Does it matter, Mr. Mowrey, whether we view this second amendment complaint as an amendment or as a supplemental complaint? Is the distinction between Rule 15a and 15b play into this at all in a legally significant or determinative way? No, Your Honor. Not according to the decision in Garrett. The court has determined that both an amended and supplemental claims in an amended complaint relate back to the original complaint because as long as they concern the same core operative facts. And the court did specifically say, or language with respect to amending versus supplemental and treated them both the same in Garrett. So, in light of the circuit split and the cert petition that's pending in Garrett, would you ask us to also consider your second position as it were? Absolutely, Your Honor. The second position, if you'd like me to address that, I'm happy to do so. Please do. Okay. So, the DOC policy and handbook set forth that the inmate grievance system, which is known as DC ADM 804, states that the grievance system is intended to deal with a wide range of issues, procedures, or events that may be of concern to inmates. But, quote, it is not meant to address incidents of an urgent or emergency nature. And the facts of this case are that this was clearly an urgent situation. And I'm not just saying that fortuitously for our benefit. It's actually from evidence in the record where we have testimony from the DOC's medical director, Dr. Tomazek, where he testified that as of, well, January, January and as of March, that Mr. Downey's situation, his severe bilateral glaucoma and his uncontrolled interocular pressures were, quote, in need of urgent care. Likewise, the off-site ophthalmologist who recommended and ordered surgeries to be done on both eyes within one to two weeks also agreed that, quote, urgent care was needed specifically with respect to his right eye first. So, if you apply the clear language of not meant to apply to an urgent or emergency situation, and then you have testimony from the defendant's main medical person agreeing this is urgent, it clearly falls outside of what this policy was meant to address. Could there not have been a request for an emergency hearing? A hearing, let's say, a prompt hearing because of Downey's emergency? Well, I'm not aware of any mechanism in place. I mean, the options are to go to eye line. The options are go to medical. And there's, of course, the grievance process, which is in no way intended to deal with a Although we don't claim that he grieved, it is clear that he filed inmate request to staff forms that went to both of the first two levels of what would have been the grievance system. And by the time he got to the second level, he had received the surgeries he requested. And, you know, by that point, of course, he's already blind. He was losing vision as of March. It was already deteriorating. And by the time May rolls around, he's asking for a magnifier. He can no longer see. This is well documented in the records. And as of September, he's seen by an on-site optometrist who indicates that he's legally blind. He has no functional vision. And so, essentially, he deteriorated before the DOC's eyes in their care. And it was almost nine months before he was ever sent back and provided the surgeries that were indicated both by the DOC and ophthalmologist that need to be done within one to two weeks on an urgent basis. Let me ask you this, if I might. You sued the Department of Corrections itself. Do you agree with the argument that's been put forth by the DOC that at least it and Defendants Bill Ross and Summers in their official capacities are entitled to 11th Amendment immunity? Well, if I may, I first want to raise the fact that there was no – okay, so the motions or summary judgments were on a single issue filed by both defendants, and that was a failure to exhaust. There was no issues raised with respect to immunity or with respect to failure to satisfy the deliberate and different standards raised. And any record made below with the court and no record before this court that it's even in the position to address the evidence that would allow it to rule on this. This is clearly a way – Well, hold on a second. Sure. Do we need some record to understand that the Department of Corrections is an arm of the Commonwealth of Pennsylvania? Can't we take judicial notice that the Department of Corrections is an arm of the Commonwealth of Pennsylvania? Sure. I have no issue with taking judicial notice that they're an agency of the Commonwealth. But to the extent that – Is your argument then that, well, they didn't raise it below, so 11th Amendment immunity, that's waivable and it's waived? That's your position? Well, it's waivable for appeal purposes that it's never been raised. However, one of the problems with it being up on appeal at this point without any record being made below is that there's evidence outside the record – I mean, we brought claims based on Monell liability that addresses policies and practices or failures to follow ones in place that fall on the DOC and the DOC defendants in their individual capacities. And so this is not simply claiming deliberate indifference of the DOC. It's under Monell liability, which allows you to include an agency in that respect. And we also have an expert – we have expert support. Monell allows you to get at municipalities, but it doesn't allow you to get at the state, does it? Well, it says an agency. So our understanding, application of the law would allow not the state itself, but an agency, whether it be a municipality or other entity, arm of the state to be included under Monell liability. Okay. Well, Judge Restrepo or Judge Fuentes, any further questions from you? One thought. You know, I'm a little troubled by the chain of events. What would stop prisoners from knowing they're going to be released soon or willing to wait until they're released from ignoring the PLRA's exhaustion requirements and just waiting until the day before they're going to be released and file a complaint immediately thereafter instead of using the prison process? Sure. So, I mean, if the question is to simply – if they have the opportunity to wait until they're out of prison and still satisfy the statute of limitations and file – You file a complaint the day before you're released, and then a couple days later you file an amended complaint. Sure. And the courts have control and discretion as to whether to allow amendments, especially if they anticipate or believe that a party is trying to game the system or circumvent some kind of process. But more so, that's a – I guess you're looking more at a floodgates type of policy argument, which this court has said, pursuant to the Serene Court's decision, that it should not and cannot apply policy arguments to a situation where the rules of SOAP procedure clearly govern over an absence of any statement in the PLRA itself. All right. Thank you. All right. Thank you, Mr. Mowery. According to the minutes I've got, Mr. Powell is up next with the 10 minutes of the 15 minutes allotted to the defense. Is that correct, Mr. Powell? It is.  If you wouldn't mind formally introducing yourself and state. Certainly. My name is Kenneth Powell. I represent CCS for medical providers who are named in this action. It's our position that the Downey case can be distinguished from the Garrett matter. In Garrett, the inmate had attempted to grieve prior to being released from prison, and largely his attempt to grieve had been accomplished by the time he was released from prison, completely different than the case here. In Downey, there was no attempt to grieve whatsoever. There was actually a purposeful decision by Mr. Downey to not avail himself of the grievance process. So here's the question for you. If he gets out and Garrett is good law and he's still within the statute of limitations, so what? I mean, what's the rule that says if you're out of prison and you still have a claim, you don't anymore have a claim because you should have grieved while you were in prison. What do you do overall for that? I didn't follow the question. I'm sorry. Well, I apologize. I understand you to be saying, essentially, follow perhaps up on the concerns that Quintez has expressed, that there could be a gaming of the system here and you shouldn't let Mr. Downey get away with this. He never did anything to grieve when he was a prisoner, and he just waited until he got out, and that's not right. Maybe I'm being too simplistic, but that sounded like the argument you were making. Did I misunderstand you? No, that is correct. Okay. Then I put my question to you again. If Mr. Downey is still within the statute of limitations, he still has a claim, and according to Garrett, he doesn't have to abide by the PLRA if he files that complaint or amended complaint or supplemental complaint once he's out. That's correct. So what? The question is, so what? What difference does it make whether he grieved when he was in prison or not? He's got a claim and he's making it. Why should we care whether he deliberately, as you put it, didn't grieve when he was in prison? Because applying Garrett to Downey just completely eliminates the requirement for exhaustion. That's exactly what Garrett said. That's what I'm asking. Once you're out, you don't have to exhaust, so what do you rely on legal authority to say, hey, it doesn't matter whether you're out or not, you should have exhausted when you were in and so you no longer have a claim. What's your legal authority? Well, the other circuits have talked about the fact that exhaustion is still required, and I know that there is a split of authority between the Third Circuit and other circuits. The other circuits' interpretation of it are that exhaustion is still required and that the individual's legal status or the time he initially files is what controls. And I understand that. But you would agree, sir, you would agree that in the Third Circuit, there's no exhaustion requirement once you're out of custody, correct? I agree. In the Third Circuit. Okay. Okay. Now, that being the case, why don't you move to the question, the urgency question. Sure. How do you win and say he should have followed grievance procedures when you have your own client saying, in hoc verba, this is urgent? Sure. There's a couple things that I would point out. Number one is the irony of all this is if Mr. Downey had grieved, he would have gotten his surgery sooner. No, no. No, the irony of this is that Mr. Downey goes to your client and says, I can't, and this is happening, and they say, yeah, this is serious, this is urgent, and he doesn't get it. And then come to court and the assertion isn't, well, it really wasn't urgent. No, it was urgent. And now the man is blind for the rest of his life, but, hey, he should agree. That's what seems ironic is that the physician defendants here, the medical providers, are pointing to prison grievance regulations to excuse not having gotten surgery for the man. You know, speaking just for myself, that feels a little ironic. If he had grieved, he would have gotten the surgery sooner. This is not a situation where – I want to understand your position. You're saying that the man goes to the authorities and says, I'm losing my vision, I can't see. The medical people agree with that proposition, but he would have received the surgery sooner if he had filled out paperwork and gone through the grievance procedure? That's really your position? And I actually believe that is absolutely true because everybody here, the medical providers that saw him, both from CCS and outside, agreed that he needed the surgery. And they said, I can't help you until you grieve it? What happened here was that the scheduling didn't take place because the person who was doing the scheduling thought the scheduling had occurred. So at the end of the day, Mr. Powell, the position you folks are taking is it's Downey's own fault. He's blind for the rest of his life because it's his fault because he didn't file an extra piece of paper. No, our position is that he didn't follow the act and that the act requires exhaustion, and there wasn't exhaustion here. This was a longstanding chronic health problem that he had. Indeed, and they knew it going in, right? He came in and they knew when he went into the facility that he had this problem, and they knew in January that it was urgent. So let's talk about the word urgent here, okay? If the internal procedures say you don't have to grieve an emergency or urgent situation, and the record shows by your client's words that this is an urgent situation, what's the foundation for saying there was a failure to exhaust? What's the factual foundation for it? Sure, that, again, this was not urgent. There's no definition of urgent within the act itself. How much more urgent can you say there's no urgency? I'm sorry, go ahead, Judge Restrepo. I think it's probably the same question. How much more urgent can it be if all medical professionals are using this term? They're using the term not in the – there's no definition within the act of what urgent is. But suppose you look it up in the dictionary and it's consistent with – it's imminent. And the doctors are all emphasizing this and nothing happens. They're emphasizing it. They're not emphasizing it in March or April or May. They're emphasizing it later in time. It wasn't urgent when the decision or the suggestion was made that he needed the surgery. It wasn't urgent at that time. Later they used the word urgent. He had a second visit, at which point surgery was recommended as soon as humanly possible. That was later in time. Yes. Well, didn't Dr. Tomczyk – and you'll have to help me with the pronunciation of his name, Mr. Powell. I'm probably doing ill by the doctor. But Dr. Tomczyk, didn't he note in Mr. Downey's record, right after the appointment that Downey had with the first off-site consultation he got in December of 2014, that the situation was urgent and required follow-up? He said it required follow-up. I don't believe he used urgent that term. Didn't he use the word urgent on that occasion? I don't believe he did. He used it later. This was a chronic, long-standing problem that he had. It was not urgent or emergent at that time. I understand there's no definition in the act of what those words mean, but as the lower court indicated, this was not a situation where he was going to lose his life or lose his vision if he didn't have surgery right away. He was getting dropped. It was getting worse, and he did lose his vision. He did, but it wasn't urgent when this first came up. When did it become urgent in your view? When did it never become urgent? Hello? I'm thinking, Your Honor. I think it became urgent in the fall. Was he still in custody then? He was. Did he get the surgery then? He got it in December and then in January. No, no. Did he get the surgery when, in your worldview, it became urgent? I think he received the surgery when it became urgent. When it came to the attention of the superintendent, he got that surgery within a couple of weeks, which I go back to if he had agreed earlier what the act requires, he would have gotten it to the retention center and he would have gotten it. Mr. Powell? Yes. He got the surgery after he was blind. Are you honestly saying it wasn't urgent until it was already too late? I'm saying that there's no definition within the act, and when he initially came up, it was not urgent. It did later become urgent. Yes. Okay. Well, I think we have occupied your ten minutes. I don't know whether Judge Fuentes or Judge Restrepo have any further questions. No, I have nothing else. The only thing I ask is that there is, as you pointed out earlier, there is a writ of cert that's still outstanding. This is an important issue, we believe, and we'd ask that you wait until the Supreme Court rules on that writ before signing. If we go down the urgency path, we don't need to wait on that writ, correct? Correct. Right. Okay. Mr. Kirkpatrick? May it please the Court. My name, again, is Sean Kirkpatrick with the Pennsylvania Office of Attorney General on behalf of the Department of Corrections. Since I only have five minutes, I want to make some very quick points. The first is sovereign immunity cannot be waived. If the first time it is raised on appeal, that is the Lombardo case. So it can be raised at any time. That's why it's sovereign immunity. The second issue is Monell liability. Will the Michigan Department of State Police, U.S. Supreme Court case, clearly says that Monell liability does not apply to state agencies? So, at the very least, the Department of Corrections, which isn't a person, for purposes of 1983, the judgment should be affirmed with regard to that. To answer the concerns that Judge Boyd... Yes, Your Honor. If I wasn't clear on that, absolutely. The other, we argue that the record is clear that there is a lack of personal involvement by the superintendent, deputy superintendent, because four days after the superintendent learned about this, Mr. Downey was seen by a surgeon and got surgery shortly thereafter. And we'll note that the waiver standard is different for appellants and appellees, that appeals are taken from judgments, not opinions, and that this court may support a judgment on any grounds if supported by the record. We think that this record is adequate because Mr. Downey never took the deposition of the superintendent or the deputy superintendent below. So, it didn't matter really to him what they did. It only mattered who they were because they were pursuing a Monell claim against them, and that's, as a matter of law, not proper. But, hold on a second. Let me ask you a question. Let me ask you a question about urgency, all right? Because I want to know whether you agree with what we've just heard from Mr. Powell on behalf of the CCS defense. Is it the correction official's position that this was not really urgent? It wasn't urgent until just around the time of the surgery? I think there's two claims, Your Honor. One is for the surgery, that's the injunctive relief, which has been abandoned, and the second is for monetary damages. I think that the claim for monetary damages wasn't urgent because that only occurred once he became blind, and then there was plenty of time to grieve that and ask for monetary damages through the grievance process. So, your position is it depends on the kind of relief you want. So, we can let you go blind, and you can't ever get anything in the way of relief about that because once you're blind, you're blind. But you could get your damages later if you agreed, but that's separate and different from whether your situation was medically urgent. Medically urgent is different from medical damages for medical injury. Am I understanding you right? Yes, although the callousness is not our intent. It may not be the intent, but it's the effect, right? We can let you go blind, but you didn't specifically say I want money separately, and you should have said that in a grievance. You got nothing. No, Your Honor, because the damages only occurred when the blindness set in, so it would have been allowable to grieve after that fact. If it is a medical emergency that needs to be dealt with immediately, we have the process. It is the inmate request forms, which Mr. Downey sent. And I will note that, again, when he sent that to the superintendent, once it came to the superintendent's attention, within four days he saw a surgeon for the first consult. And, frankly, I represent the Department of Corrections, the superintendent, and the deputy superintendent in this case. So my clients did not know about this until, well, deputy superintendent never, but my superintendent did not notice until it was, what, November, and four days later he saw a surgeon. The last thing I want to do. Well, now that may be something that gets addressed, I guess, as a factual matter and personal responsibility if this thing went to trial. But your position right now is that, as a legal matter, the grievance process, even though it says it's not for urgent situations, somehow includes a proviso that says, unless what you want is money, in which case even if there's an urgent situation, you know, you can ask for money later. That's what you're telling us? The reason for the urgency provision is so inmates contact a guard immediately if they've been stabbed or they file an inmate request so that they can be addressed. Would it be appropriate, or if I'm going blind? If that is, if you're going to go blind within the next week, yeah. Yeah. I'm not going to say that's not urgent. It has to be within the next week. It's not like I'm imminently, I'm about to go blind because I can't get surgery. Again, Your Honor, I think that if the inmate request would have gotten surgery within the first week and there would have been no blindness, then the question becomes, do you still have a grievance? Should it have happened in three days? Should it have happened in four days? I don't think we have to go that far, right, because despite what Mr. Powell said, Dr. Tomazek is on record in a deposition saying that when he saw him on December 23rd of 2014, the situation was urgent. That's a quote from the man's deposition, page 1332 of the appendix. It was urgent. So at least at the end of December 2014, the medical personnel were saying that was urgent. Doesn't that mean that the grievance process is not applicable? That, in fact, you don't have to grieve that in order to have a claim because you're in an urgent situation because of the medical standard that the Department of Corrections itself chose to put in its regulations? If you've got an urgent situation, you don't have to grieve. Well, I would say no, Your Honor, because this court has held that in order to obtain compensatory damages, you must put it into the grievance. Maybe I'm missing it, but it has a little bit of a feel like a pee and shell game going on. You can't say you have to put monetary damages into the grievance if the procedure itself says you don't have to grieve. It says you don't have to grieve if it's urgent. Well, that's why I believe that there are two separate claims, essentially. One is for the surgery and one is for the money. You don't get to decide what the man's claim is, right? He's the master of his complaint. I'm asking you for your legal authority for the position that even though the standard says in the regulation itself you don't have to grieve for an urgent situation, what do you rely on to say that doesn't mean money? If you've got a money claim, you have to grieve that. What's your authority for that? The fact that getting money isn't urgent. Okay. And I'm beyond my time, but can I answer a question that Judge Fuentes raised with my friends on the other side? I promise to be less than a minute. Yes, go ahead, Mr. Kirkpatrick. Judge Fuentes, you were expressing some concern about inmates gaming the system, and I just want to give you two statistics. One is, and this was in our brief in support of the petition for writ of certiorari in the Garrett case that's currently on appeal or is currently being decided by the – the petition is being decided by the Supreme Court. Thirty-nine percent of inmates last year were released. Every year, approximately 39 to 40 percent of the population turns over. Additionally, 38 percent of inmates serve three or fewer years. So you add a statute of limitations of two years, that means that a significant percentage of inmates, if they do not need to grieve because all they have to do is delay a decision on exhaustion until they get out, the PLRA is going to be – is going to be extremely cut down. I just wanted to make the court aware of those figures. Thank you very much. Isn't that an issue for Congress, really? There's a lot of issues for Congress, Your Honor, but – No, that specific issue. We can't amend the PLRA. No, Your Honor, but the point of the exhaustion requirement was specifically to get issues to the prison officials. So that was clearly its intent. Now, obviously, there's a conflict amongst the circuits as to the reading of specific words within – what is it off the top of my head – 1997E. But the congressional intent, and this is as found by the U.S. Supreme Court in a number of cases, was to provide a mechanism to encourage inmates, one, to not file frivolous lawsuits, but two, to raise issues in the prisons in an administrative process so that they can be addressed at the first instance by administrative officials. And if we are allowing 40 percent of the population to not do that, that defeats congressional intent. Okay. Thank you, Mr. Kirkpatrick. Thank you. Mr. Mowrey, your rebuttal. Thank you. So I'll start first with the attempted distinction made by the CCS defendants where Mr. Powell indicated that, quote, largely accomplished the grievance process in reference to Mr. Garrett's situation as opposed to ours. I just want to point out that Garrett had a mixed bag of claims that had been exhausted, claims that had been started but not exhausted as of the time that he was dismissed or released from incarceration, and also had claims that were never grieved but were available to be grieved. As well as additional facts and claims brought after he was released entirely. So it covered every situation. And this court in that decision ultimately handled all of those the same pursuant to the application of Rule 15. So I just argue that's a distinction without a difference. I also have to respond to the issue of when this situation became urgent. The court was correct that this was an urgent matter, at least as of the time that Mr. Downey was recommended for a surgical consult in January. That's when Dr. Tomaszek indicated that he agreed this required urgent care. March 18th is when Dr. Zaborski, an ophthalmologist on the outside, recommended surgery within one to two weeks. He testified it was urgent as of that time. May I ask you this? Is that communicated to the patient or is that communicated to the prison facility? Well, it obviously was communicated in some form to the prison because Dr. Tomaszek, of course, was the prison representative that approved both the surgical consult in January and also the day after the surgery is being requested, within one to two weeks, he approved the surgical procedures to happen. So Mr. Downey was aware that he was approved for the surgeries, and the DOC defendants and the CCS defendants were well aware of the need to have that within one to two weeks. If that wasn't immediate as of March 19th, Dr. Tomaszek having the first point of knowledge of that, the other individuals became aware of it shortly thereafter when Mr. Downey kept showing up asking, can you give me the status of my surgeries being scheduled? He was led to believe at all times this was happening. Mr. Mallory, can you give us any insight? Is there a place in the record where it's explicated what sort of communications there are between the medical personnel and the correctional officers or the correctional officials, I should say? Because we're hearing from Mr. Kirkpatrick essentially, I don't really have a claim against my people at all because they don't know, and from both Mr. Powell and Mr. Kirkpatrick, if your client had just grieved it, it wouldn't have happened. So is there something you can point to in the record that shows, well, no, there's regular communication between the medical personnel and the officials or something like that? There may not be, but I'm asking, is there something like that in the record? Well, Dr. Tomaszek was the one who received the orders when they come back from the off-site medical appointments, so Dr. Tomaszek did have the knowledge from the orders from first Dr. Roth. Yeah, you're missing my point. I'm not asking whether Dr. Tomaszek or the other CCS people knew. I'm asking whether there's anything in the record to show, no, the people that you named in your complaint, the two officials that you named in your complaint, Downey and, excuse me, Del Rosso and Summers, that they knew. There was some communication that put them on notice. Okay, yeah, I'm sorry. Yeah, you're referring to the non-medical DOC individuals. Yes, yes. Well, they don't have to have, and our claim against them is not direct knowledge such that it arose to deliver indifference. That's under Menil's policies and procedures. The fact that they had no knowledge is part of the concern because they didn't have policies and procedures. If that's true, how do you have any personal claim against them? I understand you may want to have a claim against them in their official capacity. It sounds to me like what you're saying and acknowledging is there's not a personal claim against them really at all. We want to advance an official claim against them but not a personal claim. Am I hearing you right? You're hearing me correct that our claim against them is solely under Monel and not for direct involvement. Okay, that's all I need to know on that point. Thanks. Now, I kind of sidetracked your rebuttal. I'll give you another minute, but you're at your time. Okay, thank you. So, finally, there is, raised by the DOC defendants, that there is no urgency to plead monetary damages. And that's one of the issues that we have with the policy and the way it's trying to be applied here. The policy clearly says it does not apply to an urgent or emergent situation, and there's nothing in the policy that says it somehow thereafter springs into existence. There is the monetary requirement grievance, but that says if you are seeking monetary damages, it has to be included in your initial grievance. But when there is no initial grievance to be made on a situation where it's exempted, it doesn't, of its own fortitude and its own language, somehow spring into existence after the fact. Our concern is that this is a policy drafted by the DOC, and they certainly had the ability to define terms and control how they wanted to word it. But as it's written, there is nothing that advises, in this situation, Mr. Downey, that his urgent matter that was not required to be exhausted or grieved, somehow they had to be grieved solely on monetary after the surgeries that he was seeking occurred. Okay. Well, we got your argument. Thank you very much, Mr. Mallory, Mr. Powell, and Mr. Kirkpatrick. We've got the case under advisement.